Appeal number 2011-N68, In Re Fisch. Good morning, Your Honors. May it please the Court, the patent office here, in this case, in determining that the Claim 964 can be read as disclosing a method that falls within the scope of either Claim 1 or Claim 4 before you for review today. With the specificity required by 35 U.S.C. Section 102. Therefore, it cannot be said that the Claim 964 anticipates either Claim 1 or Claim 4 either inherently or expressly. Now, before turning to the arguments on the anticipation, it's, of course, important to understand how the claims are going to be construed. And this is one point that we, in short, agreed upon. We thought it would be a pivotal issue in the appeal below. And that is the Board agreed with us that Claim 1 requires treating a man with both androgen deficiency, and for ease, I'll treat androgen and testosterone interchangeably here, because testosterone is the main androgen. And some disorder related thereto. So the patients being treated in Dr. Fish's Claim 1 have to have, first, low testosterone and a disorder related thereto. Okay, so the Board said that McClendon didn't disclose that. There are portions of McClendon that refer to those disorders. And it seems to suggest treating those disorders using some substance like methadone. So what's the problem? Okay, well, the problem here, Your Honor, is if we first look at what McClain discloses as his invention, we find this is a column 2 at JA 1296. McClain says, the present invention concerns methods for increasing serum levels of testosterone, including both medical therapeutic and or prophylactic treatment as appropriate. Now, if we look at those first two sentences, clearly he's administering an anti-estrogen here, galoxafene, to a mammal. It would be a male who has low to normal testosterone. And it follows, then, that if McClain treats a male with low testosterone, that's a therapeutic treatment. Then, because of the known correlation that as we age, the level of testosterone can go down, that the prophylactic treatment, according to McClain, would be at some point in time, we'd come into the office, and the good doctor would say, the problem is in column 4 of 101. So it's used here in the current practice. I think it's a matter of compounding methods. The present invention was capable of giving the symptoms of pathological conditions he had described earlier in the specification that he described pathological conditions. So why doesn't this disclose treatment of these pathological conditions? Okay, well, in reading that section of column 4, Your Honor, the pathological condition, I think it has to be reasonably read to be the pathological condition that McClain is concerned about, which goes back to that portion in column 2, which is low testosterone. And that's discussed in the declarations of Dr. Fish, Dr. Barchama, and Dr. Shobsey, which are all of record and relied upon for that point. Is that not, in and of itself, a disorder? What would that be, sir? Low testosterone. That would be a condition, a disorder. That would be... Again, why doesn't that... Well, again, the claim... The claim... That the board and we agree that the claim requires just not, if you want to call low testosterone a disorder. We can go through life with low testosterone and never develop a related disorder. We may not suffer from a loss of lupido, erectile dysfunction, and so on. And at the same time, in the board accredited Dr. Fish's unimpeached testimony that in his practice he has treated men with low testosterone but no related condition. On the other hand, males can show up at the doctor's office with loss of lupido or erectile dysfunction, and it's not related to low testosterone. It could be from stress. It could be from depression. As we said in the briefing, you just have to watch Sunday football with the ubiquitous commercials for the various pharmaceuticals that blood pressure medications can also cause these other disorders. There's no one-to-one correlation. So we think when that column four is read properly, and this is set out in the declarations, what column four is discussing is that inhibiting the symptoms, that's the prophylactic aspect of McLean's invention. A male comes in. You go to column two. A male comes in. The only thing that that male he's looking for, the doctor, is the testosterone level. If it's low, McLean says, we're going to give you the anti-estrogen, raise it, so we can prevent the occurrence of any of these related disorders. If you're at the normal level because of the expected drop-off, we're going to put you on a prophylactic regimen to inhibit the occurrence of any of these possible, and that's all it is. So anticipation is a factor. Yes, sir. Anticipation is a factor. So we're looking to see whether there's substantial evidence to support the board's factual determination. Right. So isn't there substantial evidence here that supports the board's notion that this exposes the treatment of the conditions that are caused by low testosterone? Well, we don't believe that substantial evidence supports the board's expressed anticipation finding. What they have impermissibly done, and if you go through the fact finding, is they've gone to column one of McLean, and they also refer to Dr. Fish's disclosure. The whole issue here is how you read McLean, right? The issue is how you read McLean, right? Correct. But it's not a fact question. It's a fact question. I think that the facts are that McLean describes treating men who present only low testosterone, that there's nothing in the disclosure of McLean that describes what the specificity required by 102, and we do have the declaratory evidence, which has not been rebutted. It stands unrebutted. That's irrelevant. The question is not whether you have evidence supporting your point. The question is whether there's evidence supporting the board's conclusion. Well, the only evidence the board relies upon would be the bare words in McLean, and I think if you read those bare words, you have to look at the evidence that we have that is from the viewpoint of just not the patent owner, Dr. Fish, but practicing urologists. They've considered this bare language, and they have given their considered opinion as to why it does not describe a patient having both low testosterone and a related disorder. Doesn't McLean describe that in terms of therapeutic treatment? I mean, it does describe the therapeutic treatment in detail, and then he goes on to describe some numerous symptoms, including frailty, impotence, lower libido. The therapeutic treatment is the therapeutic treatment of the condition of low testosterone, and that's discussed in the three declarations. And if you look at the test method of McLean, this brings that point home, and in a way it's a sideshow in front of the examiner. If you look at the test method beginning at column six of the reference, the examiner treated the test method as an actual method, and nothing could be further from the facts. The test method is a prophetic example, and if we read, 60 generally healthy men, so the only thing these men were examined for were for the low testosterone level, period. And I think this, in terms of substantial evidence, this supports our position that there is no substantial evidence in McLean. It supports our position that what McLean is disclosing here is his invention, is that he's treating patients that only have low testosterone. If you look at the demonstrative we put at the opening of our requirement, Dr. Fish has been very, very open all throughout this prosecution. He's made it clear that he examines men to have low testosterone but no related disorder. Now, if you look at what McLean says here, is it possible that a patient could walk in with low testosterone and a related condition? It's possible. That was the examiner's rejection, inherent anticipation. But just by saying may, that's not the law of inherent anticipation. And that's what the examiner understood. In fact, the examiner agreed with us that McLean doesn't describe a patient having low testosterone and a related disorder. It's only the board who ignores it. I don't know that that's true. Well, Your Honor, if we look at... Yes, there are mentions of inherent anticipation in the examiner's rejection, but he also seems to agree that McLean is disclosing this expressly. If we look at... Judge Dykes' point, appendix page 237, the examiner says that the McLean reference method clearly discloses treating disorders relating to testosterone deficiency in elderly men. Yes, but the examiner has confused... These disorders can be caused by low testosterone, or they could be caused by some other condition. All the disclosures in McLean, column 1, only talks about related disorders. It does not say how those men... what the other health conditions of those men were. And the examiner... But the point is that the examiner, while mentioning inherency, didn't simply rely on that, but seemed to rely on an explicit disclosure. Well, no, I think, Your Honor, having been in the Patent Office and reviewing countless rejections, when I see, and this is what we brought out in the briefing, if you read the prosecution history that came out in the reply brief, it's clearly an inherent anticipation rejection. We had an interview, and we explained at best, at best, you had a possibility. That's when the examiner dropped the 102 rejection, but made this 102-slash-103 rejection. And if you read the MPEP citation, that's the clue to the examiner that when you have a situation like this, where the invention is close, but it doesn't say what you want it to say, you can come up with this inherent anticipation-slash-primephasia-obviousness theory. I would like to reserve a few minutes, Your Honor. Thank you. Mr. Jones. Good morning. May it please the Court, good morning, Your Honors. I'd like to pick up right where you left off, and I think the best example, or the best proof, that there was no new grounds for rejection in this case is from the examiner's answer itself at page 8790, where the examiner explicitly said, quote, the reference expressly or inherently anticipates the present claims. That's at the third line, page 8 of JA 789. So, yes, the examiner did talk about inherency, largely because that's what Fish talked about, but the examiner did find that the claim expressly taught the invention. And, in fact, if you look a couple of pages earlier at page JA 785, this single-space statement of rejection goes through all the places in the claim that the board did as well. In fact, it's possible to map all of the board's claims directly onto what the examiner said. So, while the examiner discussed inherency, largely with respect to the test method, the examiner's clearly expressing her view that McLean, you know, directly taught what Fish was claiming. Now, clearly, Fish disagrees that the examiner had enough proof of that,  but the rejection, from the first time the examiner made it to the last time she made it, is always included in the express anticipation period. And the evidence that the examiner cited to, and the board cited to, is compelling. And I think what Judge Ike raised here this morning at page JA 1297, top of column 4, is probably the clearest teaching that McLean is treating not just low-testosterone levels, but the disorders that stem from that low level. And while Fish wants to sort of step away from this statement about the effective amount being effective at inhibiting the symptoms of the conditions, he still hasn't said what those symptoms are. He's saying all that's teaching is alleviating the condition. But it's clear from the previous columns of McLean that McLean is talking about cause and effect. The low testosterone level leads to the symptoms, which Fish talks about in terms of the disorders, the lack of libido, reptile dysfunction, frailty, those sort of things. He's calling disorders. I mean, it's clearly fair to read, and definitely there's substantial evidence to read McLean as stating that those disorders are the symptoms that McLean is talking about. And then when McLean talks about effective amount, he's talking about an amount that will treat those symptoms of the underlying disorder. Is the underlying disorder that is the subject of McLean simply low testosterone level, or is it something else? I think the most favorable way of reading McLean from Fish's point of view is that the disorders are the low testosterone level. I think you can also read McLean to say that those disorders are the symptoms. The disorders are those things that arise because of the low testosterone level. But either way you read it, it doesn't really matter because he's still got to deal with the previous phrase, the symptoms of the disorders. So if we read it narrowly and we say the disorder is just a low testosterone level, we're still seeing a teaching in McLean to express a clear teaching of treating the symptoms of the disorders. And those symptoms are clearly, from McLean's description, the very things he's calling disorders. But I think it's fair, as Your Honor suggests, that you could actually read McLean a little bit more broadly and say that what McLean is teaching at the top of plane four is actually treating the disorders. And I think a good clue of that is that the phrase disorders is plural, not singular. And the only disorders that McLean has mentioned previously are the very same disorders that Fish treats. Does he use the word disorders earlier in his presentation? No. What he does is he ties, in a cause-and-effect way, he ties the low testosterone level to frailty, impotence, lower libido. This is at column 2, lines 33 through 35, J.A. 1296. But in that passage, isn't there some suggestion that these conditions, frailty, impotence, and lower libido, are separate things and that the low testosterone level may lead to it, but they're not necessarily related directly there, too? There's not necessarily a one-to-one correlation or any correlation at all? Well, I disagree with any correlation at all, but I do agree that just because somebody's testosterone level suddenly drops below whatever artificial limit that the medical community wants to call low, that at that moment, the man is not going to suffer from these symptoms in terms of McLean or disorders in terms of Fish. I agree with that. But to say that when McLean then teaches getting that low level back up again and giving an amount of the antiestrogen that treats the symptoms of the disorders, that McLean is fairly teaching that when the symptoms do arise, that you've got to make sure to give an amount of this pharmaceutical that will treat those symptoms. So yes, they don't always arise, but when they do, there's clearly substantial evidence here that they can be taught with the method that McLean's using. And one thing I would add to that is that there is zero distinction between McLean's method and Fish's method. They're administering the same pharmaceutical in the exact same way. So if you were to take these two teachings, the McLean pattern, just look at it, and look at the Fish pattern side by side, and read through it, you're not going to see any difference in how Fish is approaching this issue. You're not going to see any treatment in Fish in saying, oh, here's what else I've discovered. I've discovered how to also treat the disorders. You're not going to see any of that. Fish is directed solely to the same thing McLean is directed to, increasing testosterone levels. Is it fair to say that the examiner thought that there was maybe some space here between McLean and what Fish was arguing? I think what's fair to say is that the examiner was at least going to give Fish the opportunity to make that pitch. That's what the examiner's answer shows us. It shows us there was some exchange. We don't know exactly what happened, but in the examiner's answer, the examiner says, okay, I'm going to open the door and put a 103 in here, but you're going to come in with some evidence of unexpected results. That's how the interview unfolded. She did the 103 part. He didn't come in with the unexpected results, so we don't really know where that was going to go. But she never completely backed off. As I pointed out when I started, she still maintained all the way up to the very end that there was express anticipation. And I think it's fair to read her rejection as cavity in the inherent anticipation analysis to the test method itself. It is a little confusing, because if she was so confident that there was an express teaching, it's a little surprising that she moved to a 103 situation. I suppose that that was simply to provide the applicant with an opportunity to come in, provide some evidence. That's how I view it. There was never any backing off of her analysis about the 102. She's still pointing to that language at the top of column four that Judge Dyke raised, that the Board raised, that I spoke about this morning. She's still using that analysis as well. So I agree. Certainly, I don't think she needed to go there for whatever reason she did, but what we have now is the Board's affirmance of that aspect of her rejection that was clear about an express anticipation. So unless this Court has any further questions... Thank you very much. Thank you. Mr. Smith. Thank you. To get back... Perhaps you can answer this question before you start.  We discussed that in the declarations of Dr. Fish, Dr. Shobsey, and Dr. Barchama, where they go through that analysis, in their experience, and reading the claim, the symptoms of the pathological condition. The pathological condition is low testosterone, and the symptoms could be these related disorders, and that that would be going to the prophylactic treatment. One thing to keep in mind, you read the claim, all men get this anti-estrogen, very powerful... So what you're doing is you're reading column four and saying, let's do this as a prophylactic measure to prevent these conditions from arising, rather than treating somebody who already has them. Well, no, what we're doing is we're reading it in light of column two, where Dr. McClain talks about what is his... What's the pathological condition? The pathological condition is low testosterone, but it talks about the symptoms. Do you agree that the symptoms refer to the disorders which are described in other places in column two? Well, and again, that's why I think it's important not to read just the bare words of the document, that we do have unrebutted testimony as to how that... The board is also expert on this. They read the document. They read the document. They interpreted it in a particular way. You keep saying that we have to look at these affidavits. I think it's a question of substantial evidence, whether the document provides substantial evidence for the board's conclusion. At the end of the day, we have to look at the total record, and at best, I think, as we argued in the briefing, McClain is at best an ambiguous reference. If we're looking under 102, under any measure of 102, we don't believe that McClain describes this method with the specificity. And two more points, if I may, Your Honor. Yeah, my question consumed most of your time. Okay, I appreciate it. At JA 786, which is the examiner's answer, if we go down one, two, three, four, five, six, seven, the examiner said, and this is a repeat from the final objection. This is why we appeal under this inherency. McClain does not specifically teach that the elderly men whose testosterone levels were increased by the disclosed method are suffering from the androgen deficiency disorders or disorders related to male menopause. So, again, this is, you know, we who have been living in this case have interviewed the examiner. The written record supports, supports that we came up on an inherency argument. The board ignored and the solicitor denies that it existed. Isn't that phrase, I mean, this section you read, it goes on and says, however, it's well established in the bar at the time that the invention was made that the disorders associated with testosterone deficiency in elderly men are related to low levels of testosterone. Right, and that gets into the law of anticipation. We don't have an unambiguous statement in McClain at best, and this is what Dr. Fish has admitted to. There's a possibility that men would have low T and a disorder, but there's no one-to-one correlation. So the examiner's inherent anticipation rejection had the fault, which is why I think the board shifted gears to their express anticipation, which was a surprise to us. Did the examiner make an inherent anticipation or was that something that you raised? No, if you go back to JA 785, the bold undergrounds of rejection, if you read the examiner's statement of rejection, it's 102 or 103 over McClain, and then also in view of Dr. Fish's patent is evidence of inherency. What the examiner, her evidence of inherency is that some men may, may have low T and a related disorder, and that's where her inherency argument, I think, falls, and the board's express anticipation argument falls under net money in because you have to take McClain's invention, which is just administering anti-estrogen to the patient with low T to the possibility that there might be someone that also has a related disorder. As a final point, you'll note that this is the second re-examination. We've had extended prosecution. We believe that the briefing establishes that the court should find in our favor all the merits, but we also want, if for some reason that is not your decision, then there clearly was a new ground of rejection here, and this is a re-examination, and Dr. Fish does not have an opportunity to go back and develop new evidence. Thank you very much. Thank you.